## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD A. MCANULTY,           )
                               )
           Petitioner,      )          Civil Action No. 2:19-cv-815
                               )
    v.                       )
                               )          Magistrate Judge Patricia L. Dodge
BARRY SMITH, *et al.*,         )
                               )
           Respondents.     )

## MEMORANDUM

Before the Court[1] is the Petition for a Writ of Habeas Corpus (ECF 1) filed by state prisoner

Richard A. McAnulty under 28 U.S.C. § 2254. For the reasons set forth below, the Court will deny

the Petition and deny a certificate of appealability as to each claim.

### I.    Relevant Background[2]

In this habeas case, McAnulty challenges the judgment of sentence imposed on him by the

Court of Common Pleas of Westmoreland County on his convictions of first degree murder,

burglary, and related firearms charges. The charges stemmed from an incident that occurred on

July 11, 2010, when McAnulty shot and killed Harry Mears. Attorney Timothy C. Andrews ("trial

counsel") represented McAnulty at his six-day jury trial, which was held in July 2011.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

[2] Respondents electronically filed as exhibits to their Answer (ECF 9) relevant parts of the state court record. The documents will be cited to by their Bates stamp page number as follows: "ECF __ at ___." Respondents also submitted McAnulty's original state court record, which includes the transcripts from the 2011 trial and the 2017 hearing held during McAnulty's Pennsylvania's Post Conviction Relief Act ("PCRA") proceeding.

The Superior Court of Pennsylvania summarized the evidence introduced at McAnulty's trial as follow:

> The facts of this case are as follows. On July 11, 2010, McAnulty was at his residence in Homer City, Indiana County, where he lived with his wife, Carolyn Diane McAnulty ("Diane"), and his ailing mother, Patricia. Kimberly Ann Gray ("Gray"), Patricia's caregiver and a Resta Home Health employee, was also at McAnulty's home on that day. At about 11:00 a.m., Tony Reid ("Reid"), a friend of McAnulty's, briefly stopped by the house, and he and McAnulty spent some time in the garage inspecting a broken lawnmower. Reid testified that McAnulty did not appear angry and that he "didn't smell any alcohol on his breath." N.T. Trial, 07/18/2011, at 639.
>
> After Reid left, McAnulty "stepped out on the front porch" with Diane, and got into an argument with her. N.T. Trial, 07/12/2011, at 228. The argument related to the e-mails Diane received from Harry Mears ("Mears"), the victim, during their extramarital affair in 2009. McAnulty also learned about Mears' recent e-mail "recontact" with Diane.  N.T. Trial, 07/14/2011, at 568. The argument got "loud," McAnulty sounded "angry," and there was a sound "like somebody was pushed into the front door." N.T. Trial, 07/12/2011, at 230-31
>
> When McAnulty walked back into the house, he started listening to the music from his father's funeral and "looking at papers." *Id.* at 233. He then got up, came over to Gray, "threw the e-mails" at her and told her to read them. *Id.* at 233.
>
> At trial, Diane authenticated the e-mails as "correspondence e-mails from [Mears]" to her. N.T. Trial, 07/18/2011, at 654. She testified that McAnulty had access to her e-mails, and that he kept copies of the three e-mails from Mears to her "in a drawer of a piece of furniture" in one of the rooms in their home. *Id.* at 654. She also testified that the relationship ended approximately one year before Mears' death, and that Mears recently recontacted her by sending his "last e-mail" to her on June 21, 2010, a few weeks before McAnulty shot him. *Id.* at 656. She stated that she deleted that e-mail from her inbox, and that she was unaware whether McAnulty had read it.
>
> Gray testified that McAnulty informed her "there was a job that needed to be done." N.T. Trial, 07/12/2011, at 237. McAnulty picked up his rifle and "went out the front door." *Id.* at 244. Gray tried to stop him but he "got into his burgundy truck" and drove off. *Id.* at 245. Gray then called her supervisor and reported that "there was a problem in the home" and that she understood that McAnulty was "going to Greensburg," where Mears lived, to "take care of something." *Id.* at 256-57.
>
> At approximately 2:30 p.m., McAnulty picked up Jevon Scott Little ("Little"), a hitchhiker, who was standing on Route 119, on his way back to Greensburg where he lived. McAnulty mentioned to Little that he was trying to locate his former employer who resided in Greensburg. He said that "they had a disagreement in the past" but that was over now and he "was just going to pick up some money from the guy." *Id.* at 317. McAnulty asked if Little could assist him with locating his house in Greensburg. He showed Little a piece of paper on which

the victim's name, e-mail address, telephone number and home address were written. *Id.* at 320. Little testified that he and McAnulty were talking during the entire twenty-five to thirty-minute trip to Greensburg and that McAnulty did not appear to be angry, did not show any signs of intoxication, and seemed "level-headed" and "in control." *Id.* at 322.

Upon arrival in Greensburg, McAnulty and Little stopped at a Volunteer Fire Department to get directions. Little noticed, as they exited the truck, that McAnulty was wearing a "large camouflage holster…over his left shoulder." *Id.* at 325. As there was no one present at the firehouse, McAnulty and Little then stopped at a bar to get directions. Ann Jones, a waitress at the bar, testified that McAnulty's demeanor at the bar did not strike her as unusual in any way, and that he was "[j]ust a normal customer." N.T. Trial, 07/13/2011, at 443. She also stated that, upon getting directions from two bar patrons, McAnulty left without finishing his drink.

After McAnulty and Little located Mears' residence at 615 Oakland Avenue, Little told McAnulty that he could walk to his home from there. McAnulty said that he would "take him to [his] house" first and then return. N.T. Trial, 07/12/2011, at 333. When Little was exiting McAnulty's truck, he noted a "pistol" with a "wooden grip" laying on the back seat. *Id.* at 334. The weapon was later identified as the firearm used in the shooting.

At about 3:15 pm, McAnulty arrived at Mears' home. Gray testified that McAnulty told her that when Mears opened the door, McAnulty stuck his pistol inside. Mears started screaming and shut the door but McAnulty kicked the door in and chased him upstairs. As Mears exited the window and climbed onto the roof, McAnulty shot him in the leg. Mears fell from the roof onto the ground. McAnulty went outside and stood over Mears who was crying, "Help me, please somebody help me…. God, please help me." N.T. Trial, 07/11/2011, at 73. When Mears told McAnulty "how bad it hurt," McAnulty replied, "[N]ot as bad as my heart. You'll never sleep with another man's wife." N.T. Trial, 07/12/2011, at 271. He then shot Mears twice in the chest.

Peggy Mars ("Mars"), who residing at 613 Oakland Avenue, adjacent to Mears' home, heard a loud noise followed by a plea for help. Peggy recognized Mears' voice. She exited her house and saw Mears lying between their homes, "a fountain of red blood coming out of his shoulder." N.T. Trial, 07/11/2011, at 79.

Another neighbor, Joanne Fetter ("Fetter"), who resided at 618 Oakland Avenue, across the street from Mears, heard a loud noise, looked out her front door and saw Mears come out from his second-floor window, get onto the roof above the porch and roll off the roof onto the ground. From her home, Fetter saw Mears lying between the Mears' and Mars' homes. She immediately called 911. Joanne also observed McAnulty cross Oakland Avenue "with a gun in his hand," get into his truck, and drive away. *Id.* at 98.

Jeffrey Donati ("Donati"), another neighbor, saw Mears "falling from the air and landing on the ground" at the side of his residence. *Id.* at 138. Within seconds, he "saw a man exit the residence and [go] between the houses." *Id.* at 142. Donati heard "another bang-like sound, like a gunshot." *Id.* After that, he saw a man, McAnulty, "casually walk from the area" and get into his truck. *Id.*

Dave Thomas ("Thomas"), another neighbor, identified McAnulty as carrying "a large frame revolver" and leaving the area in a "maroon F150" truck. *Id.* at 161-62. Thomas stated that McAnulty "seemed pretty calm." *Id.* at 164.

At 4:30 p.m., McAnulty called his home, spoke with Gray and told her that he had killed Mears. She testified that "he didn't sound angry." N.T. Trial, 07/12/2011, at 263. At 4:41 p.m., McAnulty called Reid on his cell phone, and said to him, "I shot him." N.T. Trial, 07/18/2011, at 641. When Reid asked him who he shot, McAnulty answered, without explaining more, "I shot him in his leg as he fell out the window." *Id.*

After arriving at his home, McAnulty started crying; he was "very nervous" and "very upset." N.T. Trial, 07/12/2011, at 267. He placed his pistol and a camouflage holster on a lawn chair on the porch. He then related to Gray the events that had occurred after he left the house that day. Shortly afterwards, McAnulty summoned police.

Officer Richard Stepinsky executed a search warrant and collected an "AR-15 Scope Rifle," the camouflage holster, multiple rounds of ammunition, and a "Ruger Super Redhawk 44 magnum revolver." *Id.* at 351, 355. He also seized a computer from McAnulty's home.

An autopsy conducted upon Mears by Cyril H. Wecht, M.D., revealed that Mears had sustained three gunshot wounds. Dr. Wecht testified that the principal cause of death was the bullet that entered Mears' back, traversed his chest, and "produced all the damage internally." N.T. Trial, 07/13/2011, at 407.

Corporal David Burlingame, a Forensic Firearm Toolmark Examiner at the Erie Regional Crime Laboratory, testified that the bullets test-fired from the AR-15 scope rifle seized from McAnulty's home were compared with the discharged bullets taken from Mears' body and were a match to a "reasonable degree of scientific certainty." *Id.* at 423.

Detective Terry Kuhns presented evidence that McAnulty "did not possess a permit to carry a firearm." *Id.* at 517. In a separate proceeding it was established that McAnulty had been convicted of rape and kidnapping in Indiana County in 1976.

The officers who observed McAnulty that evening testified that there were no "indicators" that he was intoxicated. *Id.* at 451, 537.

McAnulty waived his right to testify. He presented the testimony of Lawson Frederick Bernstein, M.D., a clinical and forensic psychiatrist. Dr. Bernstein stated that McAnulty "had a history of depression," and that he "abruptly" stopped taking his antidepressant one week before the date of the shooting. N.T. Trial, 07/14/2011, at 565. Dr. Bernstein testified that McAnulty was on a substantial dose of an antidepressant, which it was dangerous to stop taking abruptly, because withdrawal results in "very typical behavioral changes, agitation, irritability, rage events, [and] suicidal thoughts." *Id.* at 566. He also noted that McAnulty had certain physical disabilities at that time, and was mourning the "recent death of his father." *Id.* at 567. Further, Dr. Bernstein stated that McAnulty was "a prodigious user of alcohol," and that on the date of the offense, he consumed multiple alcoholic drinks. *Id.* at 570. Dr. Bernstein also testified that, according to McAnulty, on the date of the offense, he reviewed the e-mails of "fairly graphic" content that Mears sent his

wife the year before, and that upon rereading those e-mails, he felt "physically ill, heartbroken, [and] humiliated." *Id.* at 576.

Dr. Bernstein stated that he did not believe that McAnulty "would meet the criteria for legal insanity, based on any psychiatric disorder he might have." *Id.* at 578. He also opined that he did not think "the level of psychiatric disability that [McAnulty] was suffering from" would have prevented him from forming the specific intent to kill. *Id.* at 579.

(*McAnulty v. Commonwealth*, Nos. 1915 & 1916 WDA 2011, slip op. (Pa. Super. Ct. May 23, 2013) ("*McAnulty I*"), ECF 9-7 at pp. 173-80.)

Regarding the charge of criminal homicide, the trial court instructed the jury on the crimes of first and second degree murder and voluntary manslaughter.[3] (N.T. Trial, 7/18/2011 at pp. 728-734.) The defense did not dispute that McAnulty shot and killed Mears. In his closing statement, trial counsel argued that at most the jury should find McAnulty guilty of voluntary manslaughter, not first or second degree murder. (*Id.* at pp. 685-701.) The jury rejected this defense and convicted McAnulty of first degree murder. The jury also found him guilty of burglary and carrying a firearm without a license. McAnulty was also convicted of two counts of person not to possess a firearm and one count of carrying a firearm without a license.

The trial court sentenced McAnulty to the mandatory term of life imprisonment without the possibility of parole on his conviction of first degree murder. It also imposed a consecutive sentence of five to ten years' incarceration on one of the firearm's convictions. No further sentence was imposed for the remaining counts.

---

[3] The defense asserted that McAnulty went into an extended period of rage after reviewing, the morning of the killing, the four e-mails Mears sent or received from Diane. The trial court instructed the jury that it could convict McAnulty of first degree murder "only if you are satisfied beyond a reasonable doubt that the defendant was not acting under a sudden and intense passion resulting from serious provocation from the victim." (N.T., 7/18/2011 at pp. 732-33.) The trial court further explained that if, however, the jury found that when McAnulty killed Mears he was in a state of "heat of passion following serious provocation[,]" it could convict him of voluntary manslaughter. (*Id.* at 732-34.)

McAnulty, through counsel, filed a post-sentence motion that the trial court denied. (*See* Trial Ct.'s Op., ECF 9-4 at pp. 82-36.) He then filed a direct appeal with the Superior Court. Attorney Deborah L. Jackson ("direct appeal counsel"), who worked in the Public Defender's Office, represented McAnulty in this appeal in which he raised these claims:

1.  The trial court abused its discretion by permitting the prosecution to introduce autopsy photographs of the victim that were inflammatory, of little evidentiary value and only prejudiced the jury;

2.  The trial court erred in failing to give a "missing witness" instruction on Glenn Bard, whom the Commonwealth had retained to forensically analyze Mears' computer in connection with the investigation;

3.  The prosecution deliberately misled trial counsel into believing it would call Bard as a witness, thereby denying the defense time to locate, subpoena and call Bard as a defense witness when the prosecution did not call him; and,

4.  The verdict was against the weight of the evidence.

(Amended Br. for Appellant, ECF 9-6 at pp. 124-52.)

The Superior Court affirmed McAnulty's judgment of sentence in *McAnulty I.* (ECF 9-7 at pp. 172-88.) It denied each of his claims on the merits. (*Id.*)

After his direct appeal concluded, McAnulty filed in state court a *pro se* PCRA petition.[4] The trial court, now the PCRA court, appointed Attorney Eric H. Dee ("PCRA counsel") to represent McAnulty and he filed an Amended PCRA petition and claimed that trial counsel was ineffective for failing to: (1) call Bard, the Commonwealth's forensic computer expert, as a defense witness in order to authenticate the four e-mails Mears sent to or received from Diane; and (2) request that the trial court instruct the jury on the crime of third degree murder. (Amended PCRA Petition, ECF 9-1 at pp. 250-62.) Although PCRA counsel also purported to incorporate by

---

[4] McAnulty's *pro se* PCRA petition was not filed by either party electronically, but it is contained in the state court record submitted by Respondents.

reference additional claims that McAnulty had raised in his *pro se* petition, PCRA counsel did not describe these claims or provide any legal argument to support them. (*Id.* at pp. 256; PCRA Ct. Op., ECF 9-10 at pp. 283-84 (summarizing the claims McAnulty raised in his *pro se* PCRA petition)).

The PCRA court held an evidentiary hearing on August 24, 2017 at which trial counsel testified. Following this hearing, the PCRA court issued an opinion and order denying McAnulty's request for collateral relief. (PCRA Ct. Op., ECF 9-10 at pp. 285-89.) McAnulty, through counsel, filed an appeal with the Superior Court. He raised only one claim to the Superior Court: that trial counsel was ineffective for failing to call Bard as a witness to authenticate the e-mails. (Br. for Appellant, ECF 9-1 at pp. 291-312.) The Superior Court denied this claim on the merits and affirmed the PCRA court's order in *Commonwealth v. McAnulty*, No. 2 WDA 2018, slip op. (Pa. Super. Ct. July 27, 2018) ("*McAnulty II*"). (ECF 9-11 at pp. 351-57.)

After the Pennsylvania Supreme Court denied a petition for allowance of appeal (ECF 9-12 at p. 390), McAnulty, proceeding *pro se*, filed with this Court his Petition for a Writ of Habeas Corpus. (ECF 1.) McAnulty contends that he was convicted in violation of his federal constitutional rights and raises these claims[5] in this federal habeas case:

Claim 1:    The trial court erred or abused its discretion when it:

(a) allowed the Commonwealth to introduce into evidence autopsy photographs and a photograph of a bloody pillow;

(b) failed to give a missing witness instruction regarding Bard; and

(c) failed to charge the jury on the crime of third degree murder.

Claim 2:    The prosecution engaged in misconduct in violation of McAnulty's right to due process when it:

---

[5] The Court has renumbered McAnulty's claims for ease of reference.

> (a) misled the defense that it was going to call Bard as an expert witness, thereby inducing the defense to rely on that representation and not subpoena Bard to authenticate the e-mails; and
>
> (b) provided the defense in discovery a "corrupted disk" containing certain e-mails which could not be accessed another way; and,
>
> (c) placed McAnulty's AR-15 rifle on a table during trial.

Claim 3:   Trial counsel provided McAnulty with ineffective assistance when he:

> (a) failed to call Bard as a witness to authenticate the e-mails;
>
> (b) said in his opening statement that "my client shot and killed Harry Mears";
>
> (c) failed to object to the introduction of the photograph of the bloody pillow;
>
> (d) failed to seek a missing witness instruction regarding Bard; and
>
> (e) failed to adequately prepare for trial, which resulted in him being unaware that Diane did not know whether McAnulty read the last e-mail Mears had sent to her.

(ECF 1 at pp. 8-15.)

Respondents assert in their Answer (ECF 9) that the Court must deny as procedurally defaulted any claim that McAnulty did not also raise to the Superior Court. As for those claims that McAnulty did raise to the Superior Court, Respondents argue that none of them have merit. In his Reply (ECF 19), McAnulty acknowledges that many of his claims are procedurally defaulted but asserts that the Court should excuse the default of any procedurally defaulted claim and review it de novo.

## II.   Discussion

### A.   Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners in custody pursuant to a state-court judgment. It permits a federal court to grant a state prisoner a writ of habeas corpus "on the ground that he or she is in custody in violation of the

Constitution…of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable. *Id.*; *see, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Indeed, the Court is bound by the state courts' determinations of state law. *See, e.g.*, *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting *Estelle*, 502 U.S at 67-68).

It is McAnulty's burden to prove that he is entitled to the writ. *See, e.g.*, *Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017). There are other prerequisites that he must satisfy before he can receive habeas relief on his claims (for example, the burden imposed on him by the standard of review enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") which is discussed below), but, ultimately, McAnulty cannot receive federal habeas relief unless he shows that he is in custody in violation of his federal constitutional rights. 28 U.S.C. § 2254(a); *see, e.g.*, *Vickers*, 858 F.3d at 849.

**B.     Standard of Review**

In 1996, Congress made significant amendments to the federal habeas statutes with the enactment of the AEDPA. Among other things, AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). It reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted).

A finding of fact made by a state court has always been afforded considerable deference in a federal habeas proceeding. AEDPA continued that deference and mandates that "a determination

of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petition has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

AEDPA also put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). It applies to any federal habeas claim "that was adjudicated on the merits" by the Superior Court[6] and, in relevant part, it prohibits a federal habeas court from granting relief unless the petitioner established that the Superior Court's "adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

28 U.S.C. § 2254(d)(1).[7] Under § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court (here, the Superior Court) made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground. *See, e.g.*, *Richter*, 562 U.S. at 98-100; *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014).

In applying § 2254(d)(1), this Court's first task is to ascertain what law falls within the scope of the "clearly established Federal law, as determined by the Supreme Court of the United

---

[6] When applying § 2254(d), the federal habeas court considers the "last reasoned decision" of the state courts. *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008)); *Brown v. Sup't Greene SCI*, 834 F.3d 506, 512 (3d Cir. 2016).

[7] Section 2254(d)(1) applies to questions of law and mixed questions of law and fact. Those federal constitutional claims that McAnulty raised to the Superior Court presented mixed question of law and fact and therefore § 2254(d)(1) applies to this Court's review of those claims. Another provision of AEDPA's standard of review, codified at § 2254(d)(2), provides that a petitioner must show that the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This provision applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]" *Burt v. Titlow*, 571 U.S. 12, 18 (2013). Section § 2254(d)(2) is not applicable to this case because none of the Superior Court's decisions to deny McAnulty's federal constitutional claims were premised on a finding of fact. Rather, the Superior Court applied the historical facts to the law when it denied these claims.

States[,]" 28 U.S.C. § 2254(d)(1). It is "'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 280 (2016) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).

Once the "clearly established Federal law, as determined by the Supreme Court of the United States" is ascertained, this Court must determine whether the Superior Court's adjudication of the claim at issue was "contrary to" that law. *Williams*, 529 U.S. at 404-05 (explaining that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning). A state-court adjudication is "contrary to…clearly established Federal law, as determined by the Supreme Court of the United States" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," *id.* at 406.

A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent. *Williams*, 529 U.S. at 406. Thus, the issue in most federal habeas cases is whether the adjudication by the state court survives review under § 2254(d)(1)'s "unreasonable application" clause.

"A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" *Dennis*, 834 F.3d at 281 (quoting *Williams*, 529 U.S. at 413). To satisfy his burden under this provision of AEDPA's standard of review, McAnulty must do more than convince this Court that the Superior Court's decision was incorrect. *Id.* He must show that it

"'was *objectively* unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 409) (emphasis added by Court of Appeals). This means that McAnulty must prove that the Superior Court's decision "*was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*" *Richter*, 562 U.S. at 103 (emphasis added). As the Supreme Court noted:

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer, supra*, at 75, 123 S. Ct. 1166. If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Id.* at 102.

If, when evaluating a claim, the Court determines that the petitioner has satisfied AEDPA's standard of review, the Court must then "proceed to review the merits of the claim *de novo* to evaluate if a constitutional violation occurred." *Vickers*, 858 F.3d at 849 (citing *Lafler v. Cooper*, 566 U.S. 156, 174 (2012)).[8] That is because "a federal court can only grant the Great Writ if it is 'firmly convinced that a federal constitutional right has been violated[.]'" *Id.* (citing *Williams*, 529 U.S. at 389, and *Horn v. Banks*, 536 U.S. 266, 272 (2001) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review…none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]")).

---

[8] These steps "sometimes merge in cases in which the federal habeas court determines that the state court engaged in an 'unreasonable application' of clearly established Supreme Court precedent because it will be apparent from the explication of why the state court unreasonably applied that precedent that, under any reasonable application, a constitutional violation did occur." *Vickers*, 858 F.3d at 849 n.8.

If the Superior Court did not adjudicate a claim on the merits, the Court must determine whether that was because McAnulty procedurally defaulted it.[9] If the claim is procedurally defaulted, the Court should deny if for that reason. If the claim is not defaulted, or if McAnulty established grounds to excuse his default, the standard of review at § 2254(d) does not apply and the Court reviews the claim de novo. *See, e.g.*, *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). However, in all cases and regardless of whether the standard of review at § 2254(d) applies, the state court's factual determinations are presumed to be correct under § 2254(e)(1) unless McAnulty rebuts that presumption by clear and convincing evidence. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010); *Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) ("the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d).") (citing *Appel*, 250 F.3d at 210).

## C.    Exhaustion and Procedural Default

The "exhaustion doctrine" requires that a state prisoner raise his federal constitutional claims in state court through the proper procedures before he litigates them in a federal habeas petition. *See, e.g.*, *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997). It is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). It "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Additionally, and importantly, a petitioner must have "invoke[d] one complete round of the State's established appellate review process[,]" in order to satisfy the exhaustion requirement.

---

[9] The doctrine of procedural default is discussed immediately below in section II.C.

*O'Sullivan*, 526 U.S. at 845. In Pennsylvania, this requirement means that a petitioner in a non-capital case such as this one must have first presented every federal constitutional claim raised in his federal habeas petition to the Superior Court either on direct or PCRA appeal. *See, e.g.*, *Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

The doctrine of procedural default, like the doctrine of exhaustion, is "grounded in concerns of comity and federalism," *Coleman*, 501 U.S. at 730. To summarize, it provides that a Pennsylvania state prisoner in a non-capital case defaults a federal habeas claim if he: (a) failed to present it to the Superior Court and he cannot do so now because the state courts would decline to address the claims on the merits because state procedural rules (such as, for example, the PCRA's one-year statute of limitations) bar such consideration; or (b) failed to comply with a state procedural rule when he presented the claim to the state court, and for that reason the Superior Court declined to address the federal claim on the merits. *See, e.g.*, *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *O'Sullivan v. Boerckel*, 526 U.S. 838, 851-56 (1999) (Stevens, J. dissenting) (describing the history of the procedural default doctrine); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Lines v. Larkins*, 208 F.3d 153, 162-69 (3d Cir. 2000).

As the Supreme Court recently explained:

> State prisoners . . . often fail to raise their federal claims in compliance with state procedures, or even raise those claims in state court at all. If a state court would dismiss these claims for their procedural failures, such claims are technically exhausted because, in the habeas context, "state-court remedies are. . . 'exhausted' when they are no longer available, regardless of the reason for their unavailability." *Woodford v. Ngo*, 548 U.S. 81, 92-93, 126 S. Ct. 2378, 165 L. Ed.2d 368 (2006). But to allow a state prisoner simply to ignore state procedure on the way to federal court would defeat the evident goal of the exhaustion rule. *See Coleman*, 501 U.S. at 732, 111 S. Ct. 2546. Thus, federal habeas courts must apply "an important 'corollary' to the exhaustion requirement": the doctrine of procedural default. *Davila [v. Davis]*, 582 U.S., at — , 137 S. Ct. [2058], 2064 [2017]. Under that doctrine, federal courts generally decline to hear any federal claim that was not presented to the state courts "consistent with [the State's] own procedural rules."

> *Edwards v. Carpenter*, 529 U.S. 446, 453, 120 S. Ct. 1587, 146 L. Ed.2d 518 (2000).
>
> Together, exhaustion and procedural default promote federal-state comity. Exhaustion affords States "an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights," *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S. Ct. 18, 70 L. Ed.2d 1 (1981) (per curiam), and procedural default protects against "the significant harm to the States that results from the failure of federal courts to respect" state procedural rules, *Coleman*, 501 U.S. at 750, 111 S. Ct. 2546. Ultimately, "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without [giving] an opportunity to the state courts to correct a constitutional violation," *Darr v. Burford*, 339 U.S. 200, 204, 70 S. Ct. 587, 94 L .Ed. 761 (1950), and to do so consistent with their own procedures, *see Edwards*, 529 U.S. at 452-453, 120 S. Ct. 1587.

*Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022).

When a claim is procedurally defaulted a petitioner can overcome the default if he shows "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Coleman*, 501 U.S. at 750. A petitioner may avoid the default of a claim by showing "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Coleman*, 501 U.S. at 750. "'Cause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[.]" *Id.* at 753 (emphasis in original). A petitioner who defaulted a claim of trial court error may attempt to establish "cause" for the default by arguing that trial counsel was ineffective for failing to challenge the trial court's error, or that direct appeal counsel was ineffective for failing to raise the claim on appeal. Importantly, however, in order to do so the petitioner must have properly exhausted that claim of counsel's ineffectiveness in state court. *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986); *Edwards*, 529 U.S. 451-53 (a petitioner can procedurally default the claim of trial or direct appeal counsel's ineffectiveness that he is relying on to establish cause to excuse the default of another claim).

Moreover, the general rule is that, because there is no federal constitutional right to counsel in a PCRA proceeding, a petitioner cannot rely on PCRA counsel's ineffectiveness to establish the "cause" necessary to overcome the default of a federal habeas claim. *Id.*; *Davila v. Davis*, 137

S. Ct. 2058, 2062 (2017). In *Martinez v. Ryan*, 566 U.S. 1 (2012) the Supreme Court announced a narrow exception to this rule. In relevant part, it held that in states like Pennsylvania, where the law requires that claims of ineffective assistance of trial counsel be raised for the first time in a collateral proceeding,[10] a petitioner may overcome the default of a *claim of trial counsel's ineffectiveness.* To do so, the petitioner must show: (1) the defaulted claim of trial counsel's ineffectiveness is "substantial" and (2) PCRA counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984) for (3) failing to raise that claim in the "initial review collateral proceeding" (meaning to the PCRA court). *Martinez*, 566 U.S. at 17. The holding in *Martinez* is limited to defaulted claims asserting that *trial counsel was ineffective. See, e.g.*, *Davila*, 137 S. Ct. at 2062-70. It does not apply to any other type of defaulted claim. *Id.*

A petitioner may also avoid the default of a claim by showing that the federal habeas court's failure to consider it will result in a fundamental miscarriage of justice. *See, e.g.*, *Lines*, 208 F.3d at 160. This type of "gateway" actual innocence claim requires newly presented evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Schlup v. Delo*, 513 U.S. 298, 316 (1995); *see also McQuiggin v. Perkins*, 569 U.S. 383 (2013).

**D.    McAnulty's Claims**

1.    The autopsy photographs

In Claim 1(a), McAnulty asserts that the trial court abused its discretion when it permitted the Commonwealth to introduce into evidence alleged inflammatory autopsy pictures. (ECF 1 at

---

[10]  In Pennsylvania, a defendant typically may not litigate ineffective assistance of trial counsel claims on direct appeal. Such claims must be raised in a PCRA proceeding. *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002) (abrogated in part on other grounds by *Commonwealth v. Bradley*, 261 A.3d 381 (Pa. 2021)).

p. 8.) He raised this claim on direct appeal, and the Superior Court denied it on the merits. It concluded that "the trial court did not abuse its discretion in determining that the probative value of the autopsy photographs outweighed any potential prejudicial effect[,]" explaining as follows:

> Here, the Commonwealth introduced only the photographs taken in Dr. Wecht's autopsy room to establish McAnulty's intent to kill Mears, and to corroborate Dr. Wecht's testimony. *See Commonwealth v. Jacobs*, 639 A.2d 786, 789) (Pa. 1994) (stating that "even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs"). The Commonwealth minimized the possibility of prejudice to McAnulty by choosing not to exhibit "any photographs of [Mears] lying dying or dead next to the house." N.T. Trial, 07/07/2011, at 17. There was no indication in the record that the exhibited autopsy photographs were gruesome or particularly inflammatory.
>
> Although McAnulty admitted that he shot Mears because of his anger over Mears' affair with his wife, the photographs had independent evidentiary value by allowing the jury to evaluate whether McAnulty acted with deliberation. *See Jacobs, supra* ("a jury can often best perform its function if it has not been unduly insulated from gaining a full understanding of the crime itself"). By enhancing the jurors' awareness of the extent of the inflicted harm, the autopsy photographs supported the Commonwealth's theory that McAnulty purposely fired shots at Mears in places where they were designed to cause his death and that, therefore, the killing of Mears was "willful, deliberate, and premeditated." 18 Pa.C.S. § 2502(d). *See also Commonwealth v. Mitchell*, 902 A.2d 430, 444 (2006) (stating that repeated use of a deadly weapon upon vital parts of victim's body demonstrates a specific intent to kill beyond a reasonable doubt); *Commonwealth v. McCutchen*, 454 A.2d 547, 549 (Pa. 1982) ("There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.").

(*McAnulty I*, ECF 9-7 at pp. 182-83.)

This Court has no authority to review the Superior Court's decision because it was adjudicating a state law claim of alleged abuse of discretion afforded to the trial court under the Pennsylvania Rules of Evidence that is not cognizable under § 2254(a). *Estelle*, 502 U.S. at 67-68; *see also Priester*, 382 F.3d at 402  ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting *Estelle*, 502 U.S at 67-68). Although McAnulty now asserts that the trial court's decision to allow the admission of the autopsy

photographs violated his federal constitutional rights, he cannot repackage a state law claim into a federal due process claim simply by stating that he was denied a fair trial based on a ruling of state law. *See, e.g.*, *Johnson v. Rosemeyer*, 117 F.3d 104, 109-10 (3d Cir. 1997).

Additionally, because McAnulty did not argue to the Superior Court that the admission of the autopsy photographs violated his due process rights, that federal constitutional claim is procedurally defaulted. *See, e.g.*, *Duncan*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); *Niemeyer v. Cameron*, No. 1:10-cv-09, 2012 WL 760830, at *8 (W.D. Pa. Jan. 23, 2012), report and recommendation adopted, 2012 WL 760835 (W.D. Pa. Mar. 7, 2012) (when petitioner litigated on direct appeal claims of trial court errors, he did not argue that those errors violated his rights under the Due Process Clause and therefore those constitutional claims were procedurally defaulted); *Bedolla Camacho v. Garman*, No. 19-cv-3454, 2020 WL 8968103, at *8 (E.D. Pa. May 29, 2020), report and recommendation adopted, 2021 WL 1105047 (E.D. Pa. Mar. 23, 2021) (same); *Curry v. Brittain*, No. 17-cv-4842, 2018 WL 5569418, at *2 (E.D. Pa. June 26, 2018), report and recommendation adopted, No. 17-cv-04842, 2018 WL 5454290 (E.D. Pa. Oct. 29, 2018) (same).

In the alternative, if it could be said that McAnulty raised a due process claim to the Superior Court when he challenged the admission of the autopsy photographs, then this Court must also assume that the Superior Court denied that federal law claim on the merits when it adjudicated the related state law claim. *Johnson v. Williams*, 568 U.S. 289 (2013) (where there is an absence of discussion of the federal constitutional claim by the state court in its decision rejecting the related state law claim, there is a rebuttable presumption that the state court adjudicated the federal constitutional claim on the merits and that AEDPA's standard of review at § 2254(d) applies).

McAnulty fails to carry the burden imposed on by AEDPA to show that the Superior Court's adjudication of this claim was contrary to or an unreasonable application of United States Supreme Court precedent under § 2254(d)(1). Thus, AEDPA bars this Court from granting relief on this claim.

Moreover, as the Supreme Court recently made clear in *Brown v. Davenport*, 142 S. Ct. 1510 (2022), in evaluating this claim of trial court error, this Court must also apply, in addition to AEDPA's standard of review, the harmless error test outlined in *Brecht v. Abrahamson*, 507 U.S. 619, 633-35 (1993). "*Brecht* held that a state prisoner seeking to challenge his conviction" in a federal habeas case "must show" that the alleged error "had a 'substantial and injurious effect or influence' on the outcome of his trial." *Brown*, 142 S. Ct. at 1519 (quoting *Brecht*, 507 U.S. at 637). McAnulty has not met his burden. For this reason too this claim is denied.

In conclusion, McAnulty is not entitled to habeas relief on that part of Claim 1(a) in which he asserts that trial court erred in allowing the Commonwealth to introduce the autopsy photographs and that claim is denied.

## 2.   Defaulted claims of trial court error and prosecutorial misconduct

McAnulty raises several claims of trial court error and of prosecutorial misconduct that he could have raised on direct appeal but did not do so. These claims are: (1) the trial court erred in permitting the Commonwealth to introduce into evidence a picture of a bloody pillow (part of Claim 1(a) and for failing to instruct the jury on the crime of third degree murder (Claim 1(c)); and, (2) the prosecution committed misconduct when it provided the defense in discovery a "corrupted disk" containing certain e-mails which were not otherwise available (Claim 2(b)) and by placing the AR-15 rifle on a table during the trial (Claim 2(c)). (ECF 1 at pp. 8-12.) As

Respondents point out, these claims are procedurally defaulted because McAnulty did not raise them to the Superior Court on direct appeal.

McAnulty concedes that these claims are procedurally defaulted. In an attempt to avoid the default, McAnulty contends that direct appeal counsel was ineffective for failing to raise these claims to the Superior Court. This argument is rejected. In order to rely on it, McAnulty was required to have first raised the claim of direct appeal counsel's ineffectiveness to the Superior Court in his PCRA proceeding. *Carrier*, 477 U.S. at 489; *Edwards*, 529 U.S. at 451-53; *see also* Brian R. Means, Federal Habeas Manual § 9B:67, Westlaw (databased updated May 2022). He did not do so. As a result, McAnulty cannot rely on direct appeal counsel's alleged ineffectiveness to avoid the default of any of the claims at issue.

McAnulty also relies on the Supreme Court's holding in *Martinez* to overcome the default of these claims. *Martinez* only applies to defaulted claims that *trial counsel was ineffective*, however. *Martinez*, 566 U.S. at 17; *Davila*, 137 S. Ct. at 2062. The holding in that case does not extend to any other type of defaulted claim, including the claims of trial court error and prosecutorial misconduct at issue here.

Finally, as noted above, a petitioner may also avoid the default of a claim by demonstrating that the federal habeas court's failure to consider it will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *see, e.g.*, *Lines*, 208 F.3d at 160. This type of "gateway" actual innocence claim requires newly presented evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Schlup v. Delo*, 513 U.S. 298, 316 (1995); *see also McQuiggin v. Perkins*, 569 U.S. 383 (2013); *House v. Bell*, 547 U.S. 518 (2006); *Reeves v. Fayette, SCI*, 897 F.3d 154, 157 (3d Cir. 2018). The Supreme Court has cautioned that "tenable

actual-innocence gateway pleas are rare[.]" *McQuiggin*, 569 U.S. at 386. McAnulty argues generally that this exception to the procedural default doctrine applies to excuse his default of these claims (as well as the defaulted claims of ineffective assistance of trial counsel discussed below). However, he does not direct the Court to any newly presented evidence of his innocence, and this case is not one of those rare cases in which the actual-innocence gateway would apply to permit him to avoid the default of any of his claims.

Based on the above, McAnulty procedurally defaulted the claim that the trial court erred in allowing the Commonwealth to introduce the photograph of a bloody pillow (raised in Claim 1(a)) and for failing to charge the jury on the crime of third degree murder (Claim 1(c)).[11] He also procedurally defaulted the claims that the prosecution engaged in misconduct when it allegedly provided the defense with a "corrupted disk" in discovery (Claim 2(b)) and placed his AR-15 rifle on a table during trial (Claim 2(c)). There are no grounds to excuse his default. Accordingly, each claim is denied.

3.   Claims pertaining to Bard

To support his defense that at most he was guilty of voluntary manslaughter, McAnulty introduced into evidence at his trial four e-mails exchanged by Mears and Diane. The defense claimed that McAnulty read these e-mails the day he killed Mears, including the fourth and last e-

---

[11] It is worth noting that during the PCRA hearing, trial counsel testified that McAnulty's position "throughout the entire case" was that he did not want the jury to be instructed on the crime of third degree murder. According to trial counsel, because of his advanced age McAnulty viewed the sentence he would receive if he was convicted of third degree murder to be the equivalent of a life sentence. Therefore, "[McAnulty] didn't want to give the jury a choice in that regard" and "wanted to go for voluntary manslaughter only." (PCRA Hr'g Tr., 8/24/2017, at 12.) The PCRA court credited trial counsel's testimony. (PCRA Ct. Op., ECF 9-10 at p. 9.) Under 28 U.S.C. § 2254(e)(1) this Court is bound by the credibility determinations the PCRA court made unless McAnulty produced "clear and convincing evidence" that the PCRA court was wrong. *See also Vickers*, 858 F.3d at 850 n.9. McAnulty has not met that burden here.

mail that Mears had recently sent to Diane. The Commonwealth did not call either Bard or Diane to testify in its case-in-chief. The defense needed to call one of them in order to authenticate the e-mails. Bard was unavailable so the defense called Diane for that purpose and introduced the four e-mails into evidence after she authenticated them. (N.T., 7/18/11, at pp. 654-57.) On cross-examination, Diane testified that McAnulty had certainly read three of the e-mails before the killing but that she did not know whether he had read the fourth and most recent one that Mears had sent to her. (*Id.* at p. 661.)

According to McAnulty, Diane's testimony harmed his "heat of passion" defense because she could not confirm that he read Mears' last e-mail. He insists that Bard should have testified and authenticated the e-mails, and he faults both the Commonwealth and trial counsel for not calling Bard as a witness.

As discussed above, on direct appeal McAnulty claimed that the prosecution violated his right to due process because it misled the defense that it would call Bard. He also claimed that the trial court erred when it denied the defense's request for a "missing witness" instruction for Bard. (*See* N.T., 7/18/11, at pp. 628-631.) McAnulty raises these same grounds for relief in this habeas case as Claim 2(a) and Claim 1(b), respectively. The Superior Court denied these claims on the merits as follows:

> McAnulty…argues that the trial court should have given a missing witness jury instruction as to a computer forensics expert who, he claims, the Commonwealth failed to call as a witness. McAnulty asserts that the Commonwealth knew the whereabouts of the expert witness and his contact information, but provided him with only his business telephone number.
> Our Supreme Court has articulated the following "missing witness" inference rule:
>
>> W]hen a potential witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not be merely cumulative, then if such party does not produce the testimony of this

witness, the jury may draw an inference that it would have been unfavorable.

*Commonwealth v. Manigault*, 462 A.2d 239, 241 (Pa. 1983) (quotation, citations and emphasis omitted).

Here, the Commonwealth utilized the services of Glenn K. Bard, who forensically analyzed Mears' computer in connection with the investigation. Bard was able to access Mears' e-mail to Diane. As part of discovery, the Commonwealth provided McAnulty with the e-mail that supported his claim that it contributed to his "hours long period of rage." N.T. Trial, 07/14/2011, at 569. McAnulty tried to locate Bard so that he could authenticate the e-mail but was unable to do so.

There is no indication in the record that Bard was available only to the Commonwealth. The record demonstrates that the Commonwealth supplied McAnulty with Bard's business telephone number but that Bard "did not want to cooperate," and did not return the phone call of McAnulty's counsel. N.T. Trial, 07/18/2011, at 629. In addition, McAnulty could have subpoenaed Bard to secure his appearance by court order but failed to do so.

Furthermore, Bard's absence did not cause any prejudice to McAnulty as Diane authenticated the e-mail in question, which was material to the issue, and the court subsequently admitted it into evidence. Bard's testimony, therefore, would have been "merely cumulative," of Diane's testimony. *Manigault, supra*.

We conclude that the trial court did not err in denying a missing witness jury instruction.

McAnulty further claims that the Commonwealth deliberately misled him into believing that it would call Bard as a prosecution witness and subsequently failed to do so. He argues that, as a result, the Commonwealth denied him time to locate, subpoena, and call Bard as a defense witness.

Our Supreme Court has "long recognized that in criminal trials the prosecution is not absolutely bound to call to the stand all available and material eyewitnesses." *Commonwealth v. Gray*, 271 A.2d 486, 490 (Pa. 1970) (citations and quotation omitted).

The Commonwealth provides the following explanation regarding its practices with respect to prospective witness lists:

> It is customary in Westmoreland County for the Commonwealth to provide the court and trial counsel with a Prospective Witness List. The Prospective Witness List is then read to potential jurors in order to identify any relationships between potential jurors and witnesses.

Brief of Commonwealth, at 9.

Here, McAnulty's counsel and the court received the Commonwealth's Prospective Witness List. The fact that the list contained no names for computer experts demonstrated that "the Commonwealth did not intend to call Glenn Bard as a witness." *Id. See also Commonwealth v. Vorhauer*, 331 A.2d 815, 819 (Pa. Super. 1974) (noting that when someone is not on witness list, prosecution has no duty to notify appellant that that person would not testify).

Moreover, McAnulty was aware of Bard's identity, and the Commonwealth provided Bard's business phone number to him. Nevertheless, his attorney failed to subpoena Bard. Regardless, Bard's absence at trial did not prejudice McAnulty because Diane authenticated the e-mail.

Based on the foregoing, we find that the record does not support McAnulty's claim that the Commonwealth misled him into believing that it would call Bard as a prosecution witness.

(*McAnulty I*, ECF 9-7 at pp. 183-86.)

The Superior Court's decision that McAnulty was not entitled to a missing witness instruction under Pennsylvania law is a state law determination that is not subject to review by this Court. *See, e.g.*, *Priester*, 382 F.3d at 402; *Peifer v. Sup't Blaine*, 3:02-cv-72, 2006 WL 1851350, at *8 (W.D. Pa. June 6, 2006) (the petitioner's federal constitutional rights were not implicated by the absence of a missing witness instruction), report and recommendation adopted, 2006 WL 1932312 (W.D. Pa. June 30, 2006).[12] Thus, Claim 1(b) is denied.

As for McAnulty's claim that the prosecution engaged in misconduct because it allegedly misled the defense that it would call Bard (Claim 2(a)), it does raise a federal due process claim. The Superior Court's adjudication of it easily survives AEDPA's standard of review, however. That is, McAnulty has not met his burden of showing the Superior Court's decision to deny this claim of alleged prosecutorial misconduct was "contrary to" or "an unreasonable application of"

---

[12] As the court explained in *Peifer*, 3:02-cv-72, 2006 WL 1851350, at *8, "[i]nstructions that distill common sense principles, such as a missing witness instruction, are in their nature different from instructions on legal principles, such as elements of the crime or burdens of proof. Only the absence of the latter type of instruction can be the basis of constitutional error. The types of instructional error that have been held to violate due process are instructions lessening the state's burden to prove the elements of the offense charged beyond a reasonable doubt, *see e.g. Gilmore v. Taylor*, 508 U.S. 333, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993); *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), and instructions incorrectly stating substantive law, *see Smith v. Horn*, 120 F.3d at 415, *Hicks v. Oklahoma, 447 U.S. 343, 100 S. Ct. 2227, 65 L.Ed.2d 175 (1980); see also* cases cited in *Kontakis v. Beyer,* 19 F.3d 110, 115-16 n. 7 (3d Cir.), cert. denied, 513 U.S. 881, 115 S.Ct. 215, 130 L.Ed.2d 143 (1994)."

any "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). Therefore, McAnulty is not entitled to relief on Claim 2(a).

McAnulty's final claim pertaining to Bard is that trial counsel was ineffective for failing to subpoena him (Claim 3(a)). If trial counsel had done so, McAnulty contends, the defense would have called Bard to authenticate the e-mails and not Diane and thus would have avoided her testimony that she did not know whether McAnulty had read Mears' last e-mail to her. Claims of ineffective assistance are governed by the standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, it is McAnulty's burden to establish that trial counsel's "representation fell below an objective standard of reasonableness." 466 U.S. at 688. *Strickland* also requires that McAnulty demonstrate that he was prejudiced by trial counsel's alleged deficient performance. This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Counsel's errors must be so serious as to have "deprive[d] [the petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. Under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Because a petitioner cannot prevail on an ineffective assistance claim unless he establishes all prongs of the *Strickland* test, the Supreme Court permits courts to address only the prejudice prong if it is more efficient to proceed in that manner. 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") That is exactly what the Superior Court did when it adjudicated the claim at issue. It held that McAnulty did not show that he was prejudiced by trial counsel's alleged deficient performance, explaining:

[McAnulty] asserted in his PCRA petition that because Bard was unavailable he was forced to call his wife as a witness to authenticate the e-mails, and that he was prejudiced by her testimony. Amended PCRA Petition, 2/25/2015, at 10. During [McAnulty's] case-in-chief, [his] wife testified on cross-examination that she was aware that [McAnulty] had read the first three e-mails, but was unaware whether he had read the fourth and most recent e-mail, dated June 21, 2010. N.T., 7/7/2011-7/18/2011, at 660-61. According to [McAnulty], this testimony "undermined the credibility of defense expert Dr. Bernstein who wrote his report and testified based on the fact that [McAnulty] had viewed the e[-]mail dated June 21, 2010, along with the other three e-mails…[before he] went into an extended period of rage for hours[.]" Appellant's Brief at 16.

We agree with the PCRA court that [McAnulty's] wife's "testimony that she was unaware whether [McAnulty] had read the fourth e-mail of June 21, 2010, most certainly does not contradict his defense that he had read it, and her testimony which accompanied her authentication of the four e-mails was in no way prejudicial." PCRA Court Opinion, 11/28/2017, at 9. [McAnulty's] wife did not testified that [McAnulty] had *not* read the e-mail, she merely stated that she was unaware personally whether he had or had not read the e-mail. This in no way contradicts Dr. Bernstein's testimony that [McAnulty] had read all four e-mails the morning of the murder. Moreover, upon review of her testimony in its entirety, we can discern no statement that was prejudicial to [McAnulty]. In fact, her testimony bolstered his defense by affirmed that he was aware of the first three e-mails and had access to her personal e-mail account. N.T., 7/7/2011, 7/11-14/2011, & 7/18/2011, at 658-62.

Accordingly, we concluded that [McAnulty] was not prejudiced by his wife's testimony. Because [McAnulty] has not proven the prejudice prong, the PCRA court did not err in dismissing [his] PCRA petition. See [Commonwealth v. Daniels, 963 A.2d 409, 419 (Pa. 2009)] ("A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.").

(*McAnulty II*, ECF 9-11 at pp. 356-57) (emphasis and some bracketed text supplied by the Superior Court.)

As with the Superior Court's adjudication of McAnulty's other federal constitutional claims, its decision denying this claim of trial counsel's ineffectiveness withstands AEDPA's deferential standard of review. It applied the *Strickland* standard when it evaluated this claim.[13]

---

[13] Pennsylvania courts typically articulate *Strickland's* standard in three parts, while federal courts set it out in two. The legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. *See, e.g.*, *Commonwealth. v. Mitchell*, 105 A.3d 1257, 1266 (Pa. 2014) ("this Court has divided [*Strickland's*] performance component into sub-parts dealing with arguable merit and reasonable strategy. Appellant must, therefore, show that: the underlying legal *Footnote continue on next page…*

(*Id.* at 354-57.) Therefore, its adjudication was not "contrary to" *Strickland* under § 2254(d)(1). *See, e.g.*, *Williams*, 529 U.S. at 406. Nor was it an "unreasonable application of" *Strickland* under § 2254(d)(1). To demonstrate this, McAnulty must do more than convince this Court that the Superior Court's decision was incorrect. *See, e.g.*, *Dennis*, 834 F.3d at 281. As explained above, he must demonstrate that the Superior Court's decision was objectively unreasonable, which means that it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. McAnulty has not met this difficult burden. Accordingly, this Court must deny Claim 3(a).

In conclusion, none of the claims pertaining to Bard that McAnulty did raise to the Superior Court (Claims 1(b), 2(a) and 3(a)) entitle him to habeas relief. These claims are denied for the reasons set forth above.

### 4.  Defaulted claims of trial counsel's ineffectiveness

McAnulty also claims that trial counsel was ineffective because he: told the jury in his opening statement that "my client shot and killed" Mears (Claim 3(b)); failed to object to the introduction of the photograph of the bloody pillow (Claim 3(c)); failed to seek a missing witness instruction about Bard (Claim 3(d)); and failed to adequately prepare for trial and learn that Diane did not know whether McAnulty read the last e-mail Mears had sent to her (Claim 3(e)).

McAnulty admits that these claims are procedurally defaulted because he did not raise them to the Superior Court in his PCRA proceeding. Since they are claims of trial counsel's ineffective

---

claim has arguable merit; counsel had no reasonable basis for his act or omission; and Appellant suffered prejudice as a result."); *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117-18 (Pa. 2012) ("In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland*").

assistance that PCRA counsel did not litigate, McAnulty could overcome the default under *Martinez* if he demonstrated that these claims are "substantial" and that PCRA counsel was ineffective for failing to raise them. However, since none of these claims have merit, the Court will simply avoid the *Martinez* analysis and review them de novo and deny them on that basis.[14] *Lambrex v. Singletary*, 520 U.S. 518, 525 (1997) (the court may avoid the more complex issue of procedural default and evaluate the claim on the merits if it is more efficient to do so).

Turning first to Claim 3(b), the evidence that McAnulty shot Mears was overwhelming and it was thus not objectively unreasonable for trial counsel to acknowledge this obvious fact in his opening statement. Nor was McAnulty prejudiced because counsel proceeded in this manner. Doing so allowed the defense and the jury to focus on the only viable defense that McAnulty had under the circumstances, which was that although McAnulty killed Mears, he was at most guilty of voluntary manslaughter. Accordingly, Claim 3(b) is denied.

As for Claim 3(c), McAnulty has not shown that there is a reasonable probability that, if trial counsel had objected to the admission of the photograph of the bloody pillow, the trial court would have sustained his objection. Nor has McAnulty shown that the admission of the photograph prejudiced him given the strength of the evidence of his guilty. *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999) ("It is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied."). Therefore, Claim 3(c) is denied.

---

[14] As the Court of Appeals recently explained, given the Supreme Court's holding in *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), and notwithstanding McAnulty's reliance on *Martinez*, he is not entitled to an evidentiary hearing to develop any of his defaulted claims of trial counsel's ineffectiveness because these claims cannot succeed when they are evaluated under information contained only in the state court record. *Williams v. Sup't Mahanoy SCI*, 45 F.4th 713, 723-24 (3d Cir. 2022).

McAnulty's next claim, Claim 3(d), is premised on his assertion that trial counsel did not make a request to the trial court that it give the missing witness instruction. This premise is incorrect, as the transcript of McAnulty's trial confirms that trial counsel did request the missing witness instruction and that the trial court denied his request. (N.T., 7/18/11, at pp. 628-30.) Thus, there is no merit to Claim 3(d) and it is denied.

Finally, McAnulty contends in Claim 3(e) that trial counsel was ineffective because he did not learn during his investigation that Diane did not know whether McAnulty had read Mears' last e-mail. This claim is closely related to Claim 3(a), in which McAnulty faults trial counsel for failing to subpoena Bard to authentic the emails. The Superior Court's reasoning for denying Claim 3(a) in *McAnulty II* applies equally to Claim 3(e). That is, McAnulty simply was not prejudiced by Diane's testimony and thus Claim 3(e) is denied.

For the reasons set forth above, McAnulty's claims of ineffective assistance of trial counsel at Claims 3(b), (c), (d) and (e) are denied because they have no merit under de novo review.

## III.    Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from…the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). It also provides that "[a] certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).

When the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Applying

this standard here, jurists of reason would not find it debatable whether each of McAnulty's claims

should be denied for the reasons given above. Accordingly, the Court will not issue a certificate

of appealability on any of McAnulty's claims.

## IV.    Conclusion

Based on the above, the Court will deny each of McAnulty's habeas claims and will deny

a certificate of appealability with respect to each claim.

An appropriate Order follows.


Date:  September 26, 2022                                    /s/ Patricia L. Dodge
                                                            PATRICIA L. DODGE
                                                            United States Magistrate Judge